The W. H. Dunne Company, Respondent, *v.* Ezra DuMond and Another, Appellants.

Third Department, January 9, 1924.

**Sales — action under Bulk Sales Law (Pers. Prop. Law, § 44) to recover from purchasers in bulk price of goods sold to seller — original debtor abandoned his store and told his mother that she might sell goods and pay his debts — mother continued business and paid plaintiff more on account than value of goods in store at time she took possession — no evidence of sale to defendants — goods of debtor remaining in store may be identified — defendants are not liable — chattel mortgage alleged to have been given by son to mother is of no effect.**

The defendants are not liable under the Bulk Sales Law (Pers. Prop. Law, § 44) for the purchase price of goods sold to their son on the theory that the son, a storekeeper, sold the entire contents of the store without complying with the Bulk Sales Law, since it appears that at the time of the transaction alleged to have amounted to a sale to the defendants, the son told his mother in the presence of his father, that he was going to give up the store and that if she so desired she could close it up or she might run the store, sell the goods, and pay the bills due to the plaintiff; that the mother did take possession of the store and on her own account made new purchases from the plaintiff and paid for the same; that she made several payments on account of her son's bills to the plaintiff, the sum total of which amounted to more than the value of the goods in the store at the time she took possession; and that the goods which were in the store at the time the defendants took possession may be easily identified and subjected to payment of a judgment against the son in favor of the plaintiff.

The claim by the plaintiff that an inference that the mother purchased the goods and equipment may be drawn from the fact that she purchased goods for herself and so mingled them with those in the store at the time she took possession that it is impossible to separate them is not supported by the facts, since it appears that the goods and fixtures left in the store when the mother took possession can be identified.

An alleged chattel mortgage, purporting to have been given by the son to the mother after the transaction in question and upon the goods in the store to secure the mother for money loaned to the son, does not amount to a confirmation of the alleged oral contract of sale to the mother, since it is not a legal chattel mortgage, and furthermore, if the son had transferred his property to his mother, he could not give a mortgage on it, and the instrument, therefore, is not only invalid but is useless in support of the contention that the son sold the stock and fixtures to the mother.

APPEAL by the defendants, Ezra DuMond and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Chenango on the 7th day of August, 1923, upon the decision of the court rendered after a trial before the court without a jury.

*Neish & Neish* and *John G. More* [*Alexander Neish* of counsel], for the appellants.

*James P. Hill,* for the respondent.

VAN KIRK, J.:

The complaint stated a cause of action against Fred DuMond for goods sold and delivered to him by the plaintiff, the balance unpaid being $590.24; and further alleged that, in August, 1922, Fred DuMond sold and transferred to Ezra and Carrie DuMond in bulk the goods and fixtures in his store; and demanded a judgment against the present defendants under the Bulk Sales Act. (See Pers. Prop. Law, § 44, as amd. by Laws of 1914, chap. 507.)

The action was originally brought against Fred DuMond and the present defendants. Fred did not appear; the action was severed and judgment by default taken against him for the sum of $590.24.

Fred DuMond conducted a small grocery store during the years 1921 and 1922. On August 28, 1922, he told his mother, Carrie DuMond, in the presence of his father, Ezra, and his sister, that he was going to give up the store; that " she could go on and run the place or shut the damned thing up; " that he was through; she could run the store, sell the goods he had there and pay his bills to W. H. Dunne Company. This in substance is also the testimony in this respect of his father, mother and sister. There was nothing said about selling his goods and equipment to his mother, nor was any value placed upon those goods. Book accounts were not mentioned. He simply gave her authority, if she chose, to sell the goods and apply the proceeds to paying his bills.

On the Monday following September 13, 1922, Carrie DuMond went to the store and Mr. Smith, the agent of plaintiff, called. She testifies that she told Mr. Smith, if he would let her have goods, that she would be able to dispose of the goods remaining in the store. There was no representation to Smith that she had purchased from Fred the goods and equipment in the store. The proposition seemed satisfactory. She that day gave him an order for something over forty dollars worth of goods and has continued to buy goods from him substantially every Monday until this action was begun in February, 1923. The first two or three bills were sent in the name of Ezra and Fred. She called this to Mr.

Smith's attention and directed him to make out the bills to Carrie and Ezra, saying that she would personally pay these bills. Thereafter he so sent the bills and she has paid for the goods she has purchased. She quite regularly made payments on the bills which Fred owed to the Dunne Company until February, 1923, partly with Fred's money received from the government. When she stopped making payments on Fred's bills this action was begun.

In October, 1922, Carrie DuMond went to a lawyer and told him that she thought the Dunne Company was going to make trouble for her and she desired to be secured in the sum of $840, which she had from time to time loaned to Fred. He prepared a paper in the form of a chattel mortgage. To this paper the name of Fred DuMond was signed by his wife. It was signed before the list of property to be covered was attached to it. Hazel M. Bauder, a daughter of Carrie and Ezra, prepared the list for the chattel mortgage. It is conceded that this list contains much more property than was in the store. The list was made out by the daughter without any assistance and she says she entered articles by the " dozen " when she should have entered single boxes or items and she is not certain that all of the items set forth were in the store. Mr. Smith testifies that, as he estimated, there was at this time from $900 to $1,200 worth of goods and fixtures in the store. The weekly purchases, after Carrie DuMond took the store, did not exceed $50 per week and there could not have been a considerable quantity of her goods in the store at the time. Mr. Smith never viewed the goods and fixtures with the intent to estimate their value. When asked, he could name few fixtures there. He does not attempt to give any items or specify what goods were in the store.

Fred DuMond and his wife testify that, on or about the twenty-eighth day of August, Fred contemplated selling the store to an outsider and that they took an inventory of his property and fixtures. This inventory showed items of the value of $115.82. This seems a more probable amount of goods in view of other facts in the case. The dimensions of the store were about twelve by sixteen feet. For weeks Fred had been doing little business, and since August 1, 1922, he had purchased no goods. He purchased each week $50 worth of goods or less. All the time he had been selling. Carrie DuMond says that, when she went there after Fred left, there was very little in the store, a few rolls of toilet paper, a few boxes of tapioca, a few boxes of spice, a few bottles of mayonnaise dressing, a few boxes of bluing, a few boxes of Gold Dust and little things like that; on the other side of the store there were a few boxes of crackers and of cereals and different kinds of tobacco and cigars. There is also testimony that some of the goods Fred

left in the store are still there and that they can be identified. It would seem that, since Carrie DuMond had always purchased from the Dunne Company through Smith until this action was begun, those goods could be identified by Smith.

The testimony of the father and mother as to the indebtedness of Fred to his mother is contradictory. This testimony, however, except as it has a bearing upon the credibility of witnesses, is of little importance in the case.

The chattel mortgage was very irregular. Mr. Justice RHODES in his opinion says it should be disregarded; with this we agree. It was the conception and act of her attorney. Carrie DuMond was evidently not a business woman and I find nothing surprising in her testimony; its inconsistencies do not necessarily indicate an intent to give false testimony.

The court has found: " That on or about August 28th, 1922, Fred M. DuMond by an oral contract sold and conveyed the goods, wares, merchandise and fixtures in bulk which comprised his said retail grocery business, unto Carrie and Ezra DuMond." There is no direct evidence in the case justifying this finding and in our view it is not a fair inference from any facts disclosed. To support an inference that Carrie purchased the goods and equipment is the one claim that she had purchased goods for herself, paid for them and then Fred's goods had been so mingled with those she had purchased that it was impossible to separate them. We conclude the goods and fixtures Fred left in the store could be, and such as remain can be, identified. These are subject to levy under an execution issued under the judgment entered against Fred DuMond.

The court further says: " Said instrument in writing conveying goods, wares, merchandise and fixtures in bulk was in [sic] confirmatory of said oral contract." This refers to the chattel mortgage which the court in its memorandum says should be disregarded. The chattel mortgage is an inconsistent paper in any view of the case. If Fred DuMond had transferred his property to his mother he could not give a mortgage on it; and apparently the list of articles in the store, to be attached to the chattel mortgage, included the goods which Carrie DuMond had purchased from the Dunne Company and paid for, which were certainly her own goods. The chattel mortgage was not only an invalid paper, but it is useless in assisting us to reach the proper conclusion in the case.

After Carrie DuMond went into the store there was paid on Fred's account the sum of $128.14. Fred DuMond made no payments after the Delhi fair, which was on or about September fifth. Consequently Carrie had paid on the indebtedness a larger sum than the value of the goods Fred left in the store, as inven-

toried by himself and his wife. We have concluded that this inventory contains substantially the amount of goods he had on hand when he left.

There is no proof that the book accounts were ever spoken of between mother and son. These accounts were uncollectible; repeated unsuccessful efforts to collect them were made by Fred's wife. Carrie DuMond never collected any of them, nor did she make an effort to collect. They never were in any wise transferred to her.

The judgment should be reversed and the complaint dismissed, with costs in all courts to the appellants. We disapprove of findings 5, 6, 7, 8, 9, 11 and 13. We find there was no sale, transfer or assignment in bulk of any part or the whole of the stock of merchandise or merchandise and fixtures pertaining to the conducting of the business of Fred DuMond.

All concur.

Judgment reversed on the law and facts, and complaint dismissed, with costs in all courts to the appellants. The court disapproves of findings of fact 5, 6, 7, 8, 9, 11 and 13. The court finds there was no sale, transfer or assignment in bulk of any part or the whole of the stock of merchandise or merchandise and fixtures pertaining to the conducting of the business of Fred DuMond.